UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EARL THOMPSON,<br>*Plaintiff*,<br><br>v.<br><br>ANGEL QUIROS *et al.*,<br>*Defendants*. | No. 3:21-cv-00262 (JAM) |

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Earl Thompson is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He filed this action *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against three DOC officials. Thompson alleges claims under the Eighth Amendment for deliberate indifference to a substantial risk of serious harm and under the Fourteenth Amendment's Equal Protection Clause. For the reasons set forth below, I will allow one of Thompson's claims to proceed.

BACKGROUND

Thompson is currently detained at Corrigan Correctional Center ("Corrigan") in Uncasville, Connecticut.[1] In his complaint, Thompson names three defendants in their individual and official capacities: DOC Commissioner Angel Quiros, Warden Robert Martin, and DOC Chief Medical Officer Dr. Byron Kennedy.[2] He seeks declaratory and injunctive relief, as well as compensatory damages, punitive damages, and attorney's fees.[3]

---

[1] Doc. #1 at 3 (¶ 8).
[2] *Id.* at 3-4 (¶¶ 9-11). While Thompson refers to Dr. Kennedy as the "director of health care," it appears that the current Director of Health Services is Robert Richeson. *See* Connecticut State Department of Corrections, *Health Services*, available at https://portal.ct.gov/DOC/Org/Health-Services (last accessed November 12, 2021). From DOC memoranda, it appears that Kennedy is the DOC Chief Medical Officer. *See* Memorandum from Chief Medical Officer Dr. Byron Kennedy on Personal Protective Equipment (PPE) to the Staff of the State of Connecticut Department of Corrections (March 16, 2020), available at https://portal.ct.gov/-/media/DOC/Pdf/Coronavirus-3-20/Memo-Personal-Protective-Equipment-from-Dr-Byron-Kennedy-3-20.pdf (last accessed November 12, 2021).
[3] Doc. #1 at 15 (¶ 62).

1

The following facts as alleged in Thompson's complaint and the accompanying exhibits are accepted as true for the purposes of initial review only.

Thompson suffers from post-traumatic stress disorder (PTSD), which leads to conflicts with other inmates.[4] He is unable to sleep with other people present or moving in his immediate proximity.[5] If any such movement wakes him up, Thompson reacts with uncontrollable panic and anger.[6] His bunkmate's descent from the upper bunk is enough to trigger "a reoccurring terrifying episode and inflammatory PTSD event resulting in extreme panic and suffering."[7] Additionally, Thompson has two autoimmune disorders, Leukopenia and Thrombocytopenia, which cause low white blood cell count and place him at a higher risk of COVID-19 complications.[8]

On or about November 2019, Thompson wrote to his unit counselor, Campbell, about his health, his PTSD, his paranoia, and his inability to share a cell.[9] Campbell advised Thompson to contact the mental health unit while Campbell would try to keep Thompson in a single cell.[10] After Campbell was transferred to a different unit, however, defendants gave Thompson a cellmate.[11] Thompson wrote to the mental health unit on multiple occasions seeking help, but his requests were denied due to the emerging threat of COVID-19.[12] While a mental health provider evaluated him twice, Thompson was told that due to the pandemic, mental health services were short staffed and there were no mental health programs available.[13]

---

[4] *Id.* at 5 (¶¶ 15-16).
[5] *Ibid.* (¶ 16).
[6] *Ibid.* (¶ 17).
[7] *Ibid.* (¶ 18).
[8] *Id.* at 8 (¶ 31).
[9] *Id.* at 6 (¶ 24).
[10] *Ibid.*
[11] *Ibid.* (¶ 25).
[12] *Id.* at 7 (¶ 26).
[13] *Ibid.* (¶ 27).

While housed in the Fox Unit at Corrigan, Thompson requested that Unit Manager Lieutenant Peau place him in a single cell, and Peau orally told Thompson "he is doing what he can," but the decision was Martin's to make.[14] On May 25, 2020, Thompson wrote to Captain Freel requesting single-cell placement because of his mental and physical conditions.[15] On May 29, 2020, Freel responded that Thompson needed to wait until the pandemic ended.[16]

Thompson wrote twice to Martin, on or about May 30, 2020 and again on August 1, 2020, requesting single-cell status due to his PTSD and his autoimmune disorders.[17] On August 28, 2020, Martin denied the request and recommended that Thompson speak with a mental health physician.[18] Thompson asked Martin to reconsider because the DOC granted other prisoners single-cell status but he received no reply.[19] On September 8, 2020 and on December 11, 2020, Thompson wrote to former DOC Commissioner Rollin Cook and current Commissioner Quiros, respectively, seeking single-cell approval, but neither replied.[20]

On or about November 10, 2020, Thompson wrote to the Connecticut Attorney General seeking single-cell status for his health concerns.[21] On November 13, 2020, Assistant Attorney General Janelle Medeiros emailed Peau and Martin, suggesting single-cell housing for Thompson.[22]

On December 21, 2020, Thompson wrote to C.S. Iozzia asking to quit his job due to sleep deprivation and PTSD, resulting "mostly" from having a cellmate.[23] Iozzia responded on January

---

[14] *Id.* at 8 (¶ 29).
[15] *Ibid.* (¶ 30); Doc. #1-1 at 5.
[16] Doc. #1 at 8 (¶ 30); Doc. #1-1 at 5.
[17] Doc. #1 at 8 (¶ 31).
[18] *Ibid.* (¶ 32).
[19] *Id.* at 9 (¶ 33).
[20] *Id.* at 10 (¶ 40).
[21] *Id.* at 9 (¶ 34).
[22] *Ibid.* (¶ 35); Doc. #1-1 at 13.
[23] Doc. #1 at 9 (¶ 37); Doc. #1-1 at 8.

6, 2021, permitting Thompson to quit his job but denying any request for single-cell status.[24]

Prior to January 2021, Thompson experienced constant sleep deprivation, pain, fear, mental anguish, and misery from living with a cellmate.[25] He was unable to eat and lost weight due to his stress and mental anguish.[26] Thompson wrote to Dr. Kennedy on January 1, 2021, seeking help from the mental health unit, but Kennedy did not reply.[27]

On January 5, 2021, "Correctional [O]fficer P." told Thompson he would have a cellmate, and if he refused, Thompson would be placed in segregation.[28] Thompson requested a legal call to Quiros on January 21, 2021, but was told that all correspondence with the commissioner must occur through mail.[29] On January 22, 2021, Thompson wrote two more letters to Quiros and Kennedy, as well as a request to Martin, detailing his "constant stress, pain and suffering along with future health risk by having a cellmate or even as much as thinking he will be getting a cellmate."[30] He received no response.[31] That same day, Thompson filed a grievance concerning the denials of his single-cell requests.[32]

On January 23, 2021, because of the high number of positive COVID-19 tests in the Fox Unit, Thompson was moved to the Delta Unit.[33] While there, Lieutenant Bragdon told Thompson that he would be single-celled "per-medical," but Thompson later learned that this was false.[34] Thompson has been unsuccessfully requesting a written copy of the "per-medical" since then.[35]

---

[24] Doc. #1 at 9 (¶ 38); Doc. #1-1 at 8.
[25] Doc. #1 at 10 (¶ 39).
[26] Ibid.
[27] Id. at 9 (¶ 36).
[28] Id. at 10 (¶ 41).
[29] Ibid. (¶ 42).
[30] Ibid. (¶ 43).
[31] Ibid.
[32] Id. at 11 (¶ 44); Doc. #1-1 at 2.
[33] Doc. #1 at 11 (¶ 45).
[34] Ibid.
[35] Ibid.

On January 25, 2021, Thompson's attorney, Caroline Patenaude, wrote to Martin requesting that Thompson be housed in a single cell due to his autoimmune disorders.[36] On January 27, 2021, a UConn Health physician also recommended isolating Thompson.[37] That day, Thompson requested the per-medical order in writing from Bragdon, but Bragdon reassured Thompson that he would get a single cell.[38]

On February 8, 2021 at 11:17am, Thompson spoke with Martin, again requesting a single cell due to his PTSD and his heightened health risk from COVID-19.[39] Martin denied the request for single-cell status.[40] Thompson wrote to all three defendants again, "explaining in great detail all his health issues and future healt[h] risk[s]" if housed with other inmates.[41] All requests went unanswered.[42]

On February 9, 2021, an inmate infected with COVID-19 was transferred into Thompson's cell, and Thompson was threatened with segregation for requesting the inmate's removal.[43] Since then, Thompson claims he always wears a mask, "fearing for his health and safety."[44] On February 10, 2021, Thompson again voiced his concerns to Peau, who stated that he understood, but could not help because Martin denied Thompson's request.[45]

Thompson has now filed this action.[46] Along with his complaint, Thompson has filed exhibits including a grievance, requests, letters, and medical records.[47] He alleges that the

---

[36] *Ibid.* (¶ 46); Doc. #1-1 at 10.
[37] Doc. #1 at 11 (¶ 47); Doc. #7 at 9.
[38] Doc. #1 at 11 (¶ 48).
[39] *Id.* at 12 (¶ 51).
[40] *Ibid.*
[41] *Ibid.* (¶ 52).
[42] *Ibid.*
[43] *Id.* at 11 (¶ 49).
[44] *Ibid.* (¶ 50).
[45] *Id.* at 12 (¶ 54).
[46] Doc. #1.
[47] Doc. #1-1; Doc. #7.

defendants were deliberately indifferent to his health and safety by denying his single-cell status requests in violation of the Eighth Amendment. Thompson also appears to allege a violation of the Fourteenth Amendment Equal Protection Clause against the defendants for denying him single-cell status while granting other inmates that same privilege.[48]

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).[49]

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See,*

---

[48] The complaint further alleges state law claims which I will not address in this initial review order. If there were no facially plausible federal law claims against any of the named defendants, then the Court would decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. On the other hand, to the extent there are viable federal law claims, then the validity of any accompanying state law claims may be appropriately addressed by the defendants in the usual course by way of a motion to dismiss or motion for summary judgment. More generally, the Court's determination for purposes of an initial review order under 28 U.S.C. § 1915A that any claim may proceed against a defendant is without prejudice to the right of any defendant to seek dismissal of any claims by way of a motion to dismiss or motion for summary judgment in the event that the Court has overlooked a controlling legal principle or if there are additional circumstances that would warrant dismissal of a claim.
[49] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

e.g., *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

### Eighth Amendment deliberate indifference claim

Thompson claims that the denial of single-cell status constitutes cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. The Supreme Court has long recognized that prison officials violate the Eighth Amendment if they are deliberately indifferent to a substantial risk of serious harm to the safety or serious medical needs of a sentenced prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

In order to establish an Eighth Amendment claim of deliberate indifference to safety, a prisoner must show that: (1) he was subject to conditions of confinement that posed an objectively serious risk of harm, as distinct from what a reasonable person would understand to be a minor risk of harm; and (2) a defendant prison official acted not merely carelessly or negligently but with a subjectively reckless state of mind akin to criminal recklessness (*i.e.*, reflecting actual awareness of a substantial risk that serious harm to the prisoner would result). *See Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020); *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

To the extent that Thompson asserts an Eighth Amendment challenge to his conditions of confinement, the Eighth Amendment does not guarantee a prisoner the right upon request to be housed in a single cell. *See Germano v. Cook*, 2020 WL 264763 at *11 (D. Conn. 2020) (citing cases). Instead, it appears that Thompson claims that the denial of single-cell status amounts to deliberate indifference to his mental and physical health.[50]

---

[50] Doc. #1 at 13 (¶ 57).

Regarding the objective prong, it is common knowledge that COVID-19 presents a serious threat to inmates. *See Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 349 (S.D.N.Y. 2020) (collecting cases). Not only does Thompson allege that he had two medical conditions while celled with an inmate infected with COVID-19, but a physician also stated that Thompson should be isolated from other inmates due to his risk of infection.[51] *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (stating factors relevant for determining severity of a medical condition including, *inter alia*, an injury that a reasonable doctor "would find important and worthy of comment"). Thompson also alleges that he suffers from PTSD and sleep deprivation, as well as "constant" stress, pain, and suffering.[52] For the purposes of initial review, Thompson's allegations of both physical and mental conditions satisfy the objective prong. *See ibid.*; *Currytto v. Furey*, 2019 WL 1921856, at *5 (D. Conn. 2019).

Regarding the subjective prong, Thompson alleges that Martin knew of the risk to Thompson yet still denied his single-cell status requests.[53] In addition to Thompson's requests, Thompson's physician, defense counsel, and an Assistant Attorney General expressly encouraged Martin to isolate Thompson, which Martin refused to do.[54] "Officials need only be aware of the risk of harm, not intend harm. And awareness may be proven from the very fact that the risk was obvious." *Spavone v. N.Y. State Dept. of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). Construing the complaint liberally, Thompson has plausibly alleged that Martin knew of the substantial risk that Thompson would face serious harm if he did not receive single-cell status. Accordingly, I conclude that Thompson has sufficiently stated a claim of deliberate indifference against Martin for initial pleading purposes.

---

[51] *Id.* at 11 (¶ 47).
[52] *Id.* at 10 (¶¶ 39, 43).
[53] *Id.* at 12 (¶ 53).
[54] *Id.* at 11 (¶¶ 46-47); Doc. #1-1 at 10, 13.

With respect to defendants Kennedy and Quiros, Thompson states in a conclusory fashion that these two supervisory defendants received Thompson's correspondence yet did not provide single-cell status.[55] While Thompson alleges that he sent copious correspondence to these defendants, he appears to conflate the volume of his repeated requests with the defendants' actual awareness. *See Kerr v. Cook*, 2021 WL 765023, at *4 (D. Conn. 2021) (allegations of correspondence, without more, do not satisfy the subjective prong). Their failure to reply or grant Thompson's request does not create an inference of criminal recklessness. *See Chance*, 143 F.3d at 703 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."). Accordingly, I will dismiss the Eighth Amendment claims against Kennedy and Quiros.

### Fourteenth Amendment equal protection claim

Finally, Thompson seems to allege in his first count that the defendants violated his rights under the Fourteenth Amendment's Equal Protection Clause by denying him the single-cell status afforded to other inmates.[56] "The Equal Protection Clause ... commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

"To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Trowell v. Theodarakis*, 2018 WL 3233140, at *3 (D. Conn. 2018) (quoting

---

[55] Doc. #1 at 12 (¶ 52).
[56] *Ibid.* (¶ 56).

9

*Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). Alternatively, an equal protection claim can sometimes be sustained if the plaintiff "claims that he has been irrationally singled out as a 'class of one.'" *Trowell*, 2018 WL 3233140, at *3 (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)).

Thompson references specific inmates who were granted single-cell status but does not demonstrate how these inmates are similarly situated persons as required for an equal protection claim.[57] *See Robinson v. Butrisk*, 2021 WL 1978703, at *6 (D. Conn. 2021). His conclusory allegations of differential treatment, without more, fail to support such a claim. Accordingly, Thompson has not alleged plausible grounds for relief under the Equal Protection Clause of the Fourteenth Amendment.

### *Official capacity claims*

Thompson alleges his claims against Martin in both his individual capacity and in his official capacity.[58] State officials sued in their official capacities under 42 U.S.C. § 1983 are immune from suit for damages pursuant to the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-02 (1984); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002). Likewise, they are immune from declaratory relief to the extent a declaration is sought that they have previously violated the law. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Accordingly, I will dismiss the official capacity claims for damages and for a declaratory judgment.

## CONCLUSION

For the reasons stated above, the Court enters the following orders:

---

[57] *Ibid.*
[58] *Id.* at 3 (¶ 10).

(1) Plaintiff's Eighth Amendment deliberate indifference claim may proceed against Robert Martin in his individual capacity for money damages and in his official capacity for injunctive relief. All remaining claims and defendants are DISMISSED.

(2) If plaintiff believes in good faith that he can allege additional facts to sustain liability against any defendant, then he may file an amended complaint within 30 days.

(3) The Clerk shall verify the current work address for Martin with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to Martin at the confirmed address within twenty-one (21) days of this Order, and report to the court on the status of the waiver requests by not later than the thirty-fifth (35) day after mailing. If Martin fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on Martin, and Martin shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(4) The Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshals Service. The U.S. Marshal is directed to effect service of the Complaint on Martin at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, within twenty-one (21) days from the date of this Order and to file a return of service within thirty (30) days from the date of this Order. It is so ordered.

(5) Martin shall file his response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(6) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(7) The discovery deadline is extended to six months (180 days) from the date of this Order. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

(8) The deadline for summary judgment motions is extended to seven months (210 days) from the date of this Order.

(9) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion (i.e., a motion to dismiss or a motion for summary judgment) within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

(10) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify Martin or defense counsel of his new address.

(11) Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court.

As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

It is so ordered.

Dated at New Haven this 15th day of November 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge