**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

Earl Thompson,

                Plaintiff,

v.

Robert Martin, Warden

                Defendant.

Civil No. 3:21-CV-00262 (MEG)

November 19, 2024

## RULING

Plaintiff Earl Thompson ("Plaintiff" or "Thompson") filed an Amended Complaint, under 42 U.S.C. § 1983, alleging that his First and Eighth Amendment rights to the United States Constitution were violated by Defendant Robert Martin ("Defendant" or "Martin"), Warden of Corrigan-Radgowski Correctional Center ("Corrigan").[1] Defendant asserts the affirmative defense that Plaintiff failed to exhaust his administrative remedies regarding either of his claims as required by the Prison Litigation Reform Act, ("PLRA") 42 U.S.C. § 1997e(a). ECF No. 110 at 1.

Plaintiff makes two claims against Defendant based on actions allegedly taken during Defendant's time as the Warden of Corrigan. First, Plaintiff claims Defendant violated the Eighth Amendment through deliberate indifference to his serious medical needs of neutropenia and post-traumatic stress disorder ("PTSD") by failing to place him on single cell status. ECF No. 117 at 1-

---

[1]      Plaintiff is an inmate in the custody of the Connecticut Department of Correction ("DOC"), and was housed at Corrigan from approximately 2012 through July 2022. ECF No. 116, Tr. at 54:20-55:1. Defendant Robert Martin is a DOC employee. It is undisputed that, at all relevant times to this action, Martin served as the Warden of Corrigan, and was acting under color of state law.

1

5. Second, Plaintiff claims Defendant violated the First Amendment by retaliating against Plaintiff because he filed this lawsuit and grievances. *Id.* at 5-7.

As set forth below, the parties do not dispute that Plaintiff failed to exhaust administrative remedies in accordance with the PLRA. Rather, Thompson argues that he should be excused from the requirement because the applicable administrative remedies were unavailable to him. ECF No. 111 at 1; ECF No. 117 at 6-11. For the reasons that follow, the Court finds that Plaintiff may not proceed with his First and Eighth Amendment claims because Plaintiff has not shown that the administrative remedies were not available to him under *Ross v. Blake*, 578 U.S. 632 (2016).

Accordingly, the Court finds in favor of Defendant on his affirmative defense of failure to exhaust under the PLRA. ECF No. 110, 118.

## I. PROCEDURAL HISTORY

On October 31, 2023, this Court denied Defendant's motion to dismiss on the grounds that Plaintiff did not exhaust administrative remedies.[2] The Court found that, in the absence of affidavits or other evidence to support the parties' positions, Plaintiff plausibly alleged he was prevented or thwarted from exhausting administrative remedies. Defendant was directed to pursue his affirmative defense at the summary judgment stage. *Thompson v. Martin,* No. 3:21-cv-00262 (MEG), 2023 WL 7162750, *6 (D. Conn. Oct. 31, 2023).

On March 20, 2024, the parties filed a joint request to schedule an evidentiary hearing on the issue of exhaustion of administrative remedies. ECF No. 107 at 1. They agreed there was good cause to proceed directly to a hearing on exhaustion as it was more efficient than briefing the issue

---

[2]    The Court assumes the parties' familiarity with the factual and procedural background of this case. *Gannett Media Corp. v. United States*, No. 22-2160, 2022 WL 17818626, at *1 (2d Cir. Dec. 20, 2022) (assuming "familiarity with the underlying facts, the procedural history of the case, and the issues on appeal, to which we refer only as necessary to explain our decision.").

in a larger summary judgment motion, and, if needed, to hold an evidentiary hearing to determine facts that are in dispute. *Id.* at 2. The parties filed briefs on April 12 and 26, 2024 with exhibits.[3] ECF Nos. 110, 111.

On May 8, 2024, the Court held an evidentiary hearing where the following witnesses testified: (1) Plaintiff Earl Thompson; (2) Michelle King, DOC Counselor; (3) Nicholas Jacaruso, DOC Administrative Remedies Coordinator; and (4) Correctional Captain Donald Acus, Administrative Remedies Coordinator for the District 1 Administrator's Office.

The Court admitted the following exhibits into evidence: Def. Ex. A (Plaintiff's Administrative Grievances, Administrative Remedy Receipts, Inmate Request Forms, Offender Work Performance & Program Removal/Refusal Form, Disciplinary Report, Disciplinary Process Summary Report, Inmate Administrative Remedy Procedure-Notice of Time Extension, September 8, 2020 Letter from Plaintiff to Commissioner of Corrections, Consultation Form dated August 20, 2020, Health Services Remedies Receipts, Health Services Administrative Remedy-Level 1, Property Investigation Withdrawal, Lost/Damaged Property Investigation Form); Def. Ex. B (Administrative Grievance Logs from Corrigan Fiscal Years 2019-2023 and MacDougall-Walker Fiscal Years 2023-2024); Def. Ex. C (Administrative Directive 9.6 (effective date 8/15/2013)); Def. Ex. D (Administrative Directive 9.6 (effective date 4/30/2021)); Pl. Ex. A. (Deposition Transcript (excerpts) of Marshal Bragdon); Pl. Ex. B (August 8, 2020 Inmate Request Form CN 9601; September 8, 2020 Letter from Plaintiff to Commissioner of Corrections; February 10, 2021 Letter from Warden Martin to Plaintiff; March 15, 2021 Letter from Warden Martin to

---

[3]     The parties' written submissions are as follows: Defendant's Brief in Advance of Hearing on Exhaustion, ECF No. 110; Plaintiff's Response to Defendant's Brief in Advance of Hearing on Exhaustion, ECF No. 111; Plaintiff's Post-Hearing Brief, ECF No. 117; Defendant's Post-Hearing Brief on Exhaustion, ECF No. 118.

Plaintiff; March 4, 2022 Lost/Damaged Property Investigation Form CN 9609; July 14, 2022

Inmate Request Form CN 9601; August 4, 2022 Inmate Request Form CN 9601; August 18, 2022

Letter from Warden Martin to Plaintiff; August 17, 2022 Inmate Grievance Form-Level 1 CN

9602; Pl. Ex. C (Deposition Transcript (complete) Earl Thompson); Pl. Ex. D (Email from AAG

Janelle Medeiros dated 11/13/2020; Letter from Att. Caroline Patenaude to Warden Martin dated

January 25, 2021); Pl. Ex. E[4] (Deposition Transcript (complete) Warden Robert Martin); and Pl.

Ex. F (UConn Health Department of CMHC Outpatient Services Treatment Record Dr. Emily Hsu

and Dr. Pragna Kapadia, dated January 28, 2021).

  Post-hearing briefs were filed on June 24, 2024. ECF Nos. 117, 118.

## II.  STANDARD OF LAW

### A.  The PLRA's Exhaustion Requirement

  The PLRA requires prisoners to exhaust "such administrative remedies as are available"

*before* filing a federal lawsuit. *See* 42 U.S.C. § 1997e(a); *Baez v. Kahanowicz*, 278 F. App'x 27,

29 (2d Cir. 2008) (summary order) (Exhaustion of administrative remedies must be completed

*before* the inmate files suit) (emphasis added). The exhaustion requirement "applies to all inmate

suits about prison life, whether they involve general circumstances or particular episodes" *Porter*

*v. Nussle*, 534 U.S. 516, 532 (2002), and regardless of whether the administrative procedures

provide the relief that the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001).

"Exhaustion is a question of law that must be decided by the Court, not by a jury." *Morgan v.*

*Watson,* No. 3:20-cv-00254 (JBA), 2022 WL 17986695, *4 (D. Conn. Dec. 29, 2022) (citing

*Messa v. Goord*, 652 F.3d 305, 308-310 (2d Cir. 2011)).

---

[4]  Plaintiff submitted, without objection, the full deposition of Warden Martin in lieu of live testimony. Hrg. Tr. at 5:2-10. The deposition was marked as Plaintiff's Exhibit E. Hrg. Tr. 8:10-19.

The PLRA requires "proper exhaustion," meaning that plaintiffs must exhaust all available remedies in "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). The requirement of exhaustion of administrative remedies serves "two main purposes." *Id.* at 89. First, exhaustion gives an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Id.* (cleaned up) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1995)). Second, exhaustion promotes efficiency because "[c]laims can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Woodford*, 584 U.S. at 89.

Prisoners "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison officials. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Day v. Chaplin*, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (affirming grant of summary judgment for failure to exhaust administrative remedies and stating that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures"); *Timmons v. Schriro*, No. 14-CV-6606 RJS, 14-CV-6857 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

"Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."[5] *Jones v. Bock*, 549 U.S. 199, 218 (2007). In other words, the inmate must use all steps required by the administrative review process

---

[5]     The Connecticut Department of Correction has a well-established inmate grievance program set forth in Administrative Directive 9.6.

applicable to the institution in which he is confined and do so properly. *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). "Exhaustion of all available administrative remedies must occur regardless of whether the administrative procedures provide the relief that the inmate seeks." *Jordan v. LaFrance*, No. 3:18-CV-1541 (MPS), 2019 WL 5064692, at *3 (D. Conn. Oct. 9, 2019) *(citing Booth v. Churner*, 532 U.S. 731, 741 (2001)). "The inmate must exhaust his administrative remedies for each claim he asserts in his federal complaint." *Baldwin v. Arnone*, No. 3:12CV00243(JCH), 2013 WL 628660, at *5 (D. Conn. Feb. 18, 2013) (citing cases). "[A] prisoner must allege facts sufficient to alert corrections officials to the nature of the claim, and provide enough information about the conduct at issue to allow prison officials to take appropriate responsive measures." *Singh v. Lynch*, 460 F. App'x. 45, 47 (2d Cir. 2012); *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (explaining that a prisoner's "grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally").

The exhaustion requirement may be excused in limited circumstances. "An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable." *Johnson v. Barone,* 3:21-cv-01514 (KAD), 2023 WL 3949039, at *3 (D. Conn. June 12, 2023) (citing *Ross*, 578 U.S. at 642). "An administrative procedure is 'unavailable when (1) 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) the scheme is 'so opaque that it becomes, practically speaking, incapable of use,' meaning that 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it'; or (3) 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation'."[6] *Dickinson v.*

---

[6]    Plaintiff "does not assert that AD 9.6 is 'so opaque as to be unavailable.'" ECF No. 111 at 9, n.3.

*York*, 828 F. App'x 780, 782 (2d Cir. 2020) (summary order) (quoting *Ross*, 578 U.S. at 643-44).

Notably, "the Second Circuit has 'reiterated' that *Ross*'s three circumstances are not 'exhaustive'

of all the circumstances in which an administrative remedy can be considered 'unavailable'."

*Lusmat v. Papoosha*, No. 3:20-CV-1386 (RMS), 2023 WL 4236012, at *5 (D. Conn. June 28,

2023) (quoting *Romano v. Ulrich* , 49 F.4th 153, 155 (2d Cir. 2022); *Williams v. Priatno,* 829 F.3d

118, 123, n.2 (2d Cir. 2016) (the "three circumstances discussed in *Ross* do not appear to be

exhaustive.")).

The exhaustion inquiry requires a court to "look at the state prison procedures and the

prisoner's grievance to determine whether the prisoner has complied with those procedures."

*Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citations omitted).

## III. FINDINGS OF FACT

Based on the evidence presented at the hearing, the parties' written submissions and

exhibits, the Court finds the following facts.

### A.  Administrative Directive 9.6

DOC's Administrative Directive ("AD") 9.6 sets out the applicable policy and procedures

governing "Inmate Administrative Remedies."[7] Within fourteen days of inmates entering a DOC

facility, an inmate is provided with a synopsis of the administrative remedies process. Hrg. Tr.

156:9-13; 157:2-12. The Administrative Directives are also available on tablets supplied to the

---

[7]    For the relevant time frame in this case, two versions of AD 9.6 were in effect, the 2013
version which applied from August 15, 2013 until April 29, 2021, (Def. Ex. C), and the current
version, in effect since April 30, 2021. Def. Ex. D. Here the 2013 version of AD 9.6 controlled the
exhaustion process for purposes of the Eighth Amendment claims and the current version
controlled the exhaustion process for purposes of the First Amendment retaliation claims. Captain
Acus testified that when AD 9.6 changed in April 2021 the inmate population was notified of the
change by unit postings on the board and ARCs removed the old forms along with the former
directive. Hrg. Tr. 165:10-17. He stated that there were no major substantive changes in the
grievance process with regard to the 2013 AD 9.6 and the version in effect on April 30, 2021, with
the exception of the forms. Hrg. Tr. 165:18-166:13.

inmates, in the corrections facility library, and an inmate can request a copy of the Administrative Directives from their Unit Counselor or Unit Manager. Hrg. Tr. 157:13-25.

Before an inmate can file a grievance under AD 9.6, he must first seek "informal resolution." Def. Ex. C at 5 (AD 9.6(6)(A)); Def. Ex. D at 6 (AD 9.6(6)(a)(i)). The inmate must attempt to "resolve the issue verbally" and, if this effort is unsuccessful, must "submit a written request via form CN 9601." *Id.; see Riles v. Buchanan*, 656 F. App'x 577, 579-80 (2d Cir. 2016) (describing requirements of A.D. 9.6).

An Inmate Request CN 9601 is distinguishable from a Level 1 grievance CN 9602. Hrg. Tr. 158:1-12. An Inmate Request CN 9601 is not limited to complaints. *Id.* It may be used by inmates to ask for a number of things of any individual that works in the facility, or even outside the facility. *Id.* For example, an inmate might request their account balance from a unit manager. *Id.* This form is used to ask any staff member a question and the inmate will receive a written response, whereas a grievance is a formal complaint. *Id.* If an inmate files multiple CN 9601 Inmate Request forms and the responses consistently deny the request, it does not mean that the inmate exhausted administrative remedies because an informal request might not have been sent to the correct DOC staff member, or the staff member may not have the authority to respond to the request. Hrg. Tr. 159:4-15. Similarly, if an inmate sends a letter to the Commissioner of Corrections with a complaint, the letter does not exhaust administrative remedies because it does not follow a chain of command. Hrg. Tr. 159:20-160:2; 166:20-167:1.

By contrast, an Inmate Request Form CN 9602 is the first step in the grievance process. Hrg. Tr. 158:19-20. If the informal resolution steps are unsuccessful, the inmate may file a Level 1 grievance using form CN 9602, which must be submitted within thirty calendar days after the occurrence or discovery of the cause of the grievance. Def. Ex. C at 6 (AD 9.6(6)(C)); Def. Ex. D

at 6 (AD 9.6(6)(a)(ii)(4)). The grievance must include documentation of the inmate's written request to resolve the matter informally or an explanation of why such documentation is not attached. *Id.* The Unit Administrator is required to respond in writing to a Level 1 grievance within thirty business days of receipt of the grievance. Def. Ex. C at 6 (AD 9.6(6)(I)); Def. Ex. D at 6 (AD 9.6(6)(b)(i)(3)).

An inmate may appeal a Level 1 disposition to Level 2 if the Unit Administrator either denies a Level 1 grievance or fails to respond to the grievance in a timely manner. Def. Ex. C at 6-7 (AD 9.6(6)(G), (I), (K)); Def. Ex. D at 7 (AD 9.6(6)(b)(i)(4), (ii)). When the Administrator denies a Level 1 grievance, the Level 2 appeal must be filed within five calendar days of the inmate's receipt of the Administrator's decision. Def. Ex. C at 7 (AD 9.6(6)(K)); Def. Ex. D at 7 (AD 9.6(6)(b)(ii)(1)). When the Administrator fails to respond to a Level 1 grievance in a timely manner, the Level 2 appeal must be filed within sixty-five days of the date the Level 1 grievance was filed. Def. Ex. C at 8 (AD 9.6(6)(M)); Def. Ex. D. at 7 (AD 9.6(6)(b)(ii)(2)).

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or Level 2 appeals to which there has been an untimely response by the District Administrator. Def. Ex. C at 7 (AD 9.6(6)(L)); Def. Ex. D at 8 (AD 9.6(6)(b)(iii)(1)(a-c)). Thus, an inmate who properly appeals to Level 2 typically satisfies the PLRA's exhaustion requirement.

### B. Process for filing a Level 1 Grievance

During the relevant time period, 2020-2021, the process for filing a Level 1 Grievance at Corrigan was initiated by an inmate placing their Level 1 Grievance in a locked Administrative Remedies box on the unit. Hrg. Tr. 103:10-16. The Grievance Coordinator collected the grievances daily, provided a receipt to the inmate upon collection, investigated the issue, and recommended a

disposition for approval and signature by the Warden. *Id.* When a grievance is collected from the locked Administrative Remedies box it is maintained in a locked file cabinet in a locked office and it remains there until the Administrative Grievance Coordinator sees the Warden. Hrg. Tr. 135:14-136:8. A disposition date is the day a grievance is signed by Warden Martin. Hrg. Tr. 132:24-133:5. The disposition on a grievance or a property claim is deposited in the counselor's mailbox and the counselor hands it directly to the inmate. Hrg. Tr. 104:3-7. ARC King explained that under the former Administrative Directive, a counselor, not the Administrative Grievance Coordinator, would hand deliver a disposition to the inmate.[8] Hrg. Tr. 104:16-23.

If an inmate files a Level 1 grievance and he does not get a response within the time frame set forth under the directive, he may file a Level 2 grievance. Hrg. Tr. 164:5-165:3; *see* Def. Ex. C at 7 (AD 9.6(6)(I) ("If a response to a Level 1 grievance is not received within 30 business days, an inmate may appeal to Level 2)); Def. Ex. D at 7 (AD 9.6(6)(b)(i)(4)(a) (same)).

**C. Process for filing a Level 2 Grievance**

The process to file a Level 2 Grievance, ARC King explained, is similar to filing a Level 1 Grievance, whereby the inmate completes the form and places it in the locked Administrative Remedies box. Hrg. Tr. 112:11-18. The Grievance Coordinator picks up the grievance from the Administrative Remedies box, provides a copy of the receipt to the inmate, and sends the grievance to the District Administrator for disposition through interdepartmental mail. Hrg. Tr. 112:20-24. The District Administrator at all the times relevant to this disposition was Nick Rodriguez. Hrg. Tr. 113:4-5. A District Administrator is in charge of multiple facilities, and Wardens report to the District Administrator. Hrg. Tr. 113:9-14. Level 2 determinations are made by the District

---

[8]     As explained, *supra* at footnote 7, Administrative Directive 9.6 changed on April 30, 2021. Def. Ex. D at 1.

Administrator which is an appeal of the Warden's determination. Hrg. Tr. 160:11-14; *see* Hrg. Tr. 163:8-16; *see also* Def. Ex. C at 7 (AD 9.6(6)(K)); Def. Ex. D at 7 (AD 9.6(6)(b)(ii)(3)(a)).

### D. Eighth Amendment Claim-Deliberate Indifference to Medical Needs

### 1. March 2020 COVID-19 Pandemic -Requests for a Single Cell

In 2012, while in the custody of the DOC, Thompson was diagnosed with Neutropenia, an immune condition that occurs when an individual has too few white blood cells, making it more difficult for that individual's immune system to fight infection. *See* Hrg. Tr. at 11:16-24. Thompson Depo. Tr. ("Pl. Tr.") 13:20-22. At that time, he was housed at Garner and did not receive an order to be on single cell status. Pl. Tr. 15:2-13. In 2018, Thompson was transferred to Corrigan. Pl. Tr. 9:18-19 (testifying he was housed at Corrigan from 2018 to 2022). In March 2020, Martin began his tenure as warden at Corrigan, serving as warden for the remainder of Thompson's incarceration at Corrigan. *See* Martin Depo. Tr. ("Def. Tr.") at 17:4-12.

On or about March 10, 2020, Connecticut Governor Ned Lamont declared a Public Health Emergency due to the COVID-19 pandemic. *See Declaration of Public Health and Civil Preparedness Emergencies*, Ned Lamont, Governor of State of Connecticut (Mar. 10, 2020), https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf; *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 208 n.4 (D. Conn. 2020) (taking judicial notice of the executive orders issued by Governor Lamont in response to the COVID-19 pandemic). On May 30, 2020, and again on August 1, 2020, Thompson wrote letters to Warden Martin requesting single cell status due to his heightened risk of serious illness from COVID-19, due to his immune condition and PTSD. *See* ECF 70 ¶¶ 10-11; Pl. Tr. at 11:6-7. Plaintiff testified that he was never diagnosed with PTSD or any mental health conditions. Pl. Tr. 11:18-12:2.

### 2. Thompson requests a single cell on a CN 9601

On August 8, 2020, Thompson submitted a CN 9601 Inmate Request Form, "requesting to have back my single-cell status due to mental defect and the current health issues" as former-Warden Semple had provided, citing his body's inability "to fight of[f] any infections" because of a "history of thrombocytopenia, neutropenia, WBC 2.0, WC 800 and platelet of 141,000" that put him at "high risk to the Covid-19 virus and other sickness." Pl. Ex. B at 2.

On August 24, 2020, Warden Martin responded to the August 8, 2020, Inmate Request Form, denying Thompson's request for a single cell. *Id.* He explained that Connecticut was in a declared state of emergency due to the COVID pandemic and he was taking steps to keep the staff and inmates safe and secure. *Id.* He also stated that Thompson "was never on single cell status and [his] request to have one is denied." *Id.* Warden Martin testified that during his tenure at Corrigan he received numerous requests from inmates for an assignment to a single cell. Def. Tr. 45:5-14. "Pretty much the majority of the population wanted a single cell." Def. Tr. 45:18-19. He stated that "[t]he only time that [he] will give an inmate a single cell is if it was approved by medical." Def. Tr. 45:23-24. He explained that he could not recall an instance when he approved a request for a single cell based on a medical order while he was Warden at Corrigan. Def. Tr. 47:7-10. That is because, if the medical department determined that it was medically necessary to house an inmate in a single cell they would contact AP Operations and it would be handled from there. Def. Tr. 46:9-47:3, 20-25.

Plaintiff never filed a Level 1 Grievance as a follow-up to Warden Martin's denial of his August 8, 2020, Inmate Request. Hrg. Tr. 88:13. At the hearing, Plaintiff acknowledged that Inmate Requests are filed on Form CN 9601 and Level 1 Grievances are filed on Form CN 9602. Hrg. Tr. 86:6-15; Pl. Ex. B at 2. He testified that an Inmate Request is an informal notice that is filed *before* a formal Level 1 Grievance is filed. Hrg. 86:18-21. 18.

On or about November 13, 2020, Plaintiff testified that he settled another lawsuit against the DOC. Hrg. Tr. 88:19-89:11; Pl. Ex. D at 2. In connection with that settlement, the Assistant Attorney General representing the DOC sent an email dated November 13, 2020, stating she agreed to make a "suggestion" to the Unit Manager Lt. Peau that Plaintiff remain housed in a single cell. Pl. Ex. D. at 2. She further stated, "[a]s we explained to [Thompson] and as I am sure you know, we cannot guarantee Mr. Thompson remain housed in a single cell. We defer to your judgment regarding safety and security with regard to housing assignments." *Id.* At the time the lawsuit was settled, he was housed in a cell by himself. Hr. Tr. 89:12-15; 89:22-24. Warden Martin testified he was unaware of the email. Def. Tr. 55:2-3. At some point after the email was sent, Plaintiff got a cellmate.

On or about September 8, 2020 and December 11, 2020 (resent), Thompson wrote to the Commissioner of Corrections. Def. Ex. A at 34-38; Pl. Ex. B at 3-4. The letter was marked "received" at the Commissioner's Office on March 9, 2021. Pl. Ex. B at 3. On March 15, 2021, Warden Martin responded to Plaintiff's "inmate request to the Commissioner regarding a single cell which was forwarded to [his] office for review and response", denying Plaintiff's request for a single cell. Pl. Ex. B at 6. Defendant added, "[p]lease be advised, my office had responded to a similar request from you on February 10, 2021. Your request for a single cell is denied." *Id.; see* Pl. Ex. F at 5 ("This is in response to your inmate request regarding a single cell. Please be advised, your request is denied, no single cell status will be given."). Warden Martin testified that nothing changed between the February 10 response and the March 15 response. Def. Tr. 78:12-79:14.

**3. Thompson files a grievance regarding his denial of his request for single cell status**

On January 22, 2021[9], Plaintiff filed a grievance, CN 9602, regarding the repeated denials of his requests to be housed in a single cell "due to mental/P.T.S.D. issues." Def. Ex. A at 29-31; Def. Ex. B at 58, ECF No. 1, Ex. A. Plaintiff testified that this was the only Level 1 grievance he filed related to his Eighth Amendment claim. Hrg. Tr. 66:18-23. The DOC received the Level 1 grievance on February 4, 2021, which Warden Martin signed acknowledging receipt. *Id.* at 32:20-21; 67:18-20; Def. Ex. A at 29 (Administrative Remedy Receipt dated 2/4/2021); Def. Tr. 56:21-23.

While his grievance was pending, on January 25, 2021, Plaintiff's then-counsel, Attorney Caroline Patenaude, wrote a letter to Warden Martin requesting housing in a single cell due to "leukopenia and thrombocytopenia, which are autoimmune disorders that put him at higher risk for complications and a more severe case of COVID-19." Pl. Ex. D at 3. Warden Martin testified that he had no recollection of this letter, "it is possible, [his secretary] . . . forwarded it directly to medical and I did not see it." Def. Tr. 62:16-23.

Also, while his grievance was pending, on January 28, 2021, Plaintiff was seen by Hematology/Oncology Fellow Dr. Emily Hsu at UConn Health-Department of CMHC Outpatient Services, in consultation with Dr. Pragna Kapadia. Pl. Ex. F. Dr. Hsu recommended that Plaintiff return for a follow-up appointment in six months with labs prior. *Id.* at 1-2. She added, "given his neutropenia and ongoing COVID pandemic, he will need to continue to be in isolation in his cell." *Id.* at 2.

---

[9]     The document is misdated January 22, 2020; but Plaintiff confirmed that it should have been dated January 22, 2021. Hrg. Tr. (Thompson) 28:3-5.

Plaintiff's January 22, 2021, Level 1 Grievance was received by the DOC on February 4, 2021. Based on the Grievance Log maintained by the DOC, Mr. Thompson's Level 1 Grievance was decided on February 28, 2021. Def. Ex. B at 58. The disposition stated in part, "[s]ingle cell is denied. Should you need mental health, please write to them, if it is an emergency please stop an officer on tour and let them know." Def. Ex. A at 31. The grievance form noted that the decision could be appealed. *Id.*

On February 20, 2021, before receiving the disposition of his Level 1 Grievance, Plaintiff submitted his original complaint for filing in Court. Hrg. Tr. 47:8-12; ECF No. 1 at 16. Plaintiff's original complaint was docketed in the District Court on March 1, 2021. Hrg. Tr. 47:11-12; ECF No. 1; Pl. Tr. 18:22-24 (Plaintiff signed the original complaint on February 20, 2021).

The only Level 1 Grievance Plaintiff filed related to his Eighth Amendment claim was on January 22, 2021. Hrg. Tr. 66:18-23. As Plaintiff acknowledged, he did not appeal the denial of the January 22, 2021 Level 1 Grievance. Hrg. Tr. 42:14-16. Plaintiff offered several reasons for not appealing. First, he stated he did not receive the denial until it was "past the appeal date." *Id.* at 42:18-21. Second, he claimed he "didn't receive the grievance—any appeal form with it." *Id.* at 42:25-43:1. Third, he stated the "grievance . . . came back ripped up: and he received the grievance weeks later." *Id.* at 43:14-15. He explained that because the appeals deadline is five days, he could not appeal past the deadline. *Id.* at 43:19-21. Fourth, he testified that he spoke to ARC King, who he recalled said "[the appeal] was denied and that was that" and "Martin already denied it." *Id.* at 42:24; 43:8-10. He testified that it was his impression that he would have no success on appeal. *Id.* at 44:3-5.

On cross-examination, Plaintiff agreed that the DOC received his Level 1 Grievance on February 4, 2021. Hrg. Tr. 67:18-21; Def. Ex. A at 29. He acknowledged that Administrative

Directive 9.6(K) provides that "[a]n inmate may appeal a Level 1 disposition to Level 2 within five (5) calendar days of *receipt* of the decision." Def. Ex. C at 7 (emphasis added); Hrg Tr. 716-22.

### 4. DOC's handling of Plaintiff's Jan. 22, 2021 Level 1 Grievance

Plaintiff received the disposition of the Level 1 Grievance on February 28, 2021. Def. Ex. A at 32, 38; Hrg Tr. 77:15-17; 111:18-112:10; 139:9-12. ARC King provided Thompson with a legible copy of his grievance stating, "[t]his is to inform you that there was a copier malfunction with your CN9602. I have attached a clean copy of your disposition to be sure you understand the outcome." Def. Ex. A at 38; Hrg. Tr. 107:25-108:2;132:14-23. ARC King testified that the disposition packet provided on February 28, 2021 included "a copy of the grievance because it had squished up in the copier, the letter saying that there was a copier error, as well as a copy of this bottom disposition part that had an approval by Warden Martin on it, it was on like a blank piece of paper, it showed it on the bottom in the same spot it would have been." Hrg. Tr. 112:4-10; 107:1-3; Def. Ex. A at 30-31. She stated an appeal form was included with the letter and disposition. Hrg. Tr. 116:6-10. ARC King testified she did not have a conversation with Plaintiff about his request for a single cell at any time and did not tell him that filing a Level 2 grievance would be futile. Hrg. Tr. 108:11-109:3; 130:14-24; 138:7-9. Thompson could have used the Level 2 Grievance Form that was provided in the disposition packet to appeal. Hrg. Tr. 112:11-14. Based on the timing of the disposition, Thompson had until March 4, 2021, to file a Level 2 grievance. Hrg. Tr. 118:24-119:1.

16

### D. First Amendment – Retaliation Claim

### 1. On March 24, 2022, Thompson files a Lost/Damaged Property Form

On February 4, 2022, while Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction was pending, Plaintiff was transferred to a "dry" cell in the medical unit at Corrigan. Hr. Tr. 65: 20-66:3. Plaintiff's property was packed up and taken during the move to a medical cell. Hrg. Tr. 49:15-17. Among his confiscated belongings was a Memorex boom box, television, and other personal property. While in the possession of the DOC, both his Memorex boom box and television were damaged. Hrg. Tr. 50:21.

On or about March 24, 2022, Thompson filed a Lost/Damaged Property Investigation Form seeking to have his television and boom box fixed or replaced. Def. Ex. A at 55; Hrg. Tr. 50:23-25. ARC King testified that she spoke to Warden Martin about approving the replacement of Plaintiff's television.[10] Hrg. Tr. 127:7-10. In April 2022, prison officials replaced Thompson's television but not his boom box. Hrg. Tr. 50:24. Thompson testified Lieutenant Pearson told him that Plaintiff's boom box would be fixed or replaced. Hrg. Tr. 50:25-51:2. His boom box was never fixed or replaced. Hrg. Tr. 51:4-6. The ARC processing the property claim noted on June 8, 2022, that the T.V. was replaced and the property claim was withdrawn by Plaintiff. Def. Ex. A at 55. Plaintiff testified that he "withdrew the property claim after Lieutenant Pearson and Warden Martin told [him the] boom box would be replaced." Hrg. Tr. 53:4-6. He claimed that he spoke to both Lieutenant Pearson and Warden Martin on the day he withdrew the property claim, June 8,

---

[10]      ARC King testified that she was the ARC at Corrigan, at the time Plaintiff filed his January 22, 2021, Level 1 grievance requesting a single cell status. Hrg. Tr. 129:14-19. Nicholas Jacaruso replaced her as ARC at Corrigan in March 2022. Hrg. Tr. 142:12-13. Both King and Jacaruso testified that King addressed Thompson's lost/damaged property claim. Hrg. Tr. 130:1-6; 142:15-17. Jacaruso would have addressed any retaliation claim during this timeframe. Hrg. Tr. 130:7-9

2022, based on verbal assurances that the boom box would be replaced. Def. Ex. A at 55; Hrg. Tr. 53:11-23; 54:8.

## 2. Difference between exhausting a retaliation claim and a lost/damaged property claim

A retaliation claim and a lost/damaged property claim are distinct claims that are addressed differently within the DOC. Hrg. Tr. (King) 120:18-121:8.

Under Administrative Directive 9.6, in effect prior to April 2021, to bring a Lost/Damaged Property complaint, the inmate completes form CN 9609 and files it in the locked Administrative Remedies box, the ARC picks up the form and provides a receipt to the inmate. Def. Ex. C at 11-12; Hrg. Tr. 122:1-124:15. "If the property issue is resolved at this level, the inmate shall complete and submit CN 9610, Property Investigation Withdrawal, to the ARC to indicate that the issue has been resolved." Def. Ex. C at 12. If the claim is not resolved, the inmate may obtain a CN 9612, complete the form, and shall mail the completed and notarized form to the attention of the Lost Property Board. Def. Ex. D at 11 (Form 9612-effective 4/30/2021); Def. Ex. C. at 12 (Form 9611-effective 8/15/2013); Hrg. Tr. 127:3-6 (ARC King testifying that the procedures for filing a lost/damaged property claim in 2021 or 2013 were the same). A claim of lost or damaged property is investigated by the administrative remedies coordinator and the disposition is rendered at the facility level. Hrg. Tr. 169:4-10. If an inmate seeks further redress of a property disposition, it goes outside that facility. Hrg. Tr. 169:9-12. An appeal of lost or damaged property is different than an appeal of a grievance. Hrg. Tr 125:1-4.

By contrast, to exhaust a retaliation claim based on destruction of an inmate's property, an inmate must follow the grievance procedure as set forth in Administrative Directive 9.6 through Levels 1, 2, and 3. Hrg. Tr. 125:5-7; Def. Ex. C at 6-7. A retaliation claim is a staff-related complaint, which is investigated and addressed through the administrative remedies grievance

process. Hrg. Tr. 121:9-18; 124:16-18, *see* Hrg. Tr. 149:5-18; Hrg. Tr. (Acus) 169:13-19. A property claim involves money, whereas the grievance process does not involve money. Which claim to file depends on what the inmate seeks. Hrg. Tr. (Acus) 170:170:2-3. Captain Acus explained that, if the inmate is seeking redress for a lost or damaged item, such as a boom box, he must do so by filing a property claim. Hrg. Tr. (Acus) 170:18-25. Appeal of a property disposition is made to the Lost Property Board. Hrg. Tr. 171:21-25. By contrast, a grievance requires: 1. A clear and concise statement of the complaint; 2. a statement of who the inmate spoke to or wrote to before filing a complaint; and, 3. a statement of what the inmate wants the DOC to do about it. Hrg. Tr. 170:4-10. Captain Acus testified that "[i]f you are saying an officer came in my cell and grabbed my boom box and smashed it, you want some type of discipline done for that staff member, that is something that would be in the wheelhouse in the purview of the Warden. But the Warden isn't necessarily just going to be able to write a check for that boom box." Hrg. Tr.170:11-17. Moreover, he stated that "even if the Warden were to validate that that happened," all the Warden could do would be place the staff member on administrative leave, the matter would be investigated, and ultimately Labor Relations would address discipline of the staff member. Hrg. Tr. 171 9-17. "There is no monetary gain for the grievance process." Hrg. Tr. 172:14-15. Finally, Captain Acus testified that all grievances, including grievances related to retaliation, are subject to a time limitation of thirty days from the incident or discovery of the cause of the grievance. Hrg. Tr. 173:10-25; Def. Ex. C at 6 (AD 9.6(6)(C) ("The grievance must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance.")); Def. Ex. D at 7 (AD 9.6(6)(a)(ii)(4) ("Any CN9602, Inmate Grievance Form-Level 1, must be filed within 30 calendar days of the occurrence or discovery of the cause of the Grievance.")).

Warden Martin testified that lost/damaged property claims were addressed through the claims commission, which is a separate chain of command. Def. Tr. 43:6-15. He testified he typically did not address property claims, could recall no instances when a property claim was presented to him, and was unfamiliar with the process for filing a property claim. Def. Tr. 44:1-8.

3. **July 8, 2022-Transfer to MacDougall-Walker ("MacDougall") Correctional Institution**

Plaintiff was transferred to MacDougall on July 8, 2022. Hrg. Tr. 54:24-55:1. Warden Martin denies knowing anything about the transfer to MacDougall. Def. Tr. 84:3-4.

On July 14, 2022, Plaintiff filed an Inmate Request Form, CN 9601, to Warden Martin detailing conversations he had with Property Officer Conrad, Lieutenant Pearson, and Warden Martin about his boom box and representations they made to replace the boom box. Pl. Ex. B at 8-9. Plaintiff requested that Warden Martin put this promise in writing so that he could pursue replacement through the property officer at MacDougall. Pl. Ex. B at 8-9; Hrg. Tr. 57:2-15. ARC King testified that she spoke to Plaintiff about the replacement of the T.V. but not the boom box. Hrg. Tr. 109:22-24; 134:23-25; 136:25; 138:7-9. She stated that the T.V. was replaced because it was "shown to be proven to be an error on our part, so it was replaced." Hrg. Tr. 110:22-23.

On July 22, 2022, Plaintiff filed an Inmate Request Form, CN 9601, to Property Officer Conrad regarding replacement of his boom box. Def. Ex. A at 4. He stated he was willing to pay for the replacement of the boom box "to avoid the entire 'long grievance process'." He requested that Property Officer Conrad update him . *Id.* Officer Conrad responded on August 2, 2022, stating "I have no authority on this matter." *Id.*

Plaintiff filed an Inmate Request Form, CN 9601, on August 4, 2022, to "Grievance Personnel" regarding the destruction of his boom box. Pl. Ex. B at 10-12.

On August 17, 2022, Plaintiff filed a Level 1 Grievance, CN 9602, regarding the destruction of his boom box. *Id.* at 13. The CN 9602 made no mention of any complaint of retaliation. Plaintiff concedes he did not mention the word "retaliation" in the August 17, 2022, grievance, explaining that "[w]hen I got to MacDougall, all I wanted was my boom box . . . replaced. After what I went through at Corrigan, I didn't want to start any problem there." Hrg. Tr. 60:5-17.

On August 18, 2022, Warden Martin responded to the July 14, 2022, Inmate Request stating that Plaintiff's boom box was "not on the approved boom box list" and, if Thompson had a court order stating that he was approved to have a boom box, he could forward that request to the Warden at MacDougall for his review. Pl. Ex. B at 12.

Warden Martin stated that prior to sending the August 18 response, he contacted Property Officer Conrad to check whether Plaintiff was on the approved boom box list. Def. Tr. 101:3-4.[11] As long as the boom box remained in working condition, the inmate could retain possession of it. Once damaged, the inmate would lose the privilege and was removed from the approved list. That is, boom boxes in DOC facilities would go away by attrition. Def. Tr. 88:15-18. The Warden maintained that he would not tell an inmate he would replace a boom box. Rather, he would direct the inmate to file a property claim. Def. Tr. 89:14-21. The Warden testified that Plaintiff was not part of the initial settlement that would have placed him on the approved boom box list, (Def. Tr. 90:18-91:2), and that Plaintiff did not provide a court order or settlement agreement permitting

---

[11]    The DOC at some point banned boom boxes in correctional facilities, however a settlement agreement was reached through litigation permitting inmates who had a boom box prior to settlement to retain their boom boxes. The "approved boom box list" also permitted an inmate who was transferred between facilities to retain a boom box. Def. Tr. 87:21-88:7.

him to retain a boom box. Def. Tr. 90:18-23. Regardless, any property claim would be reviewed and decided by the claims commission. Def. Tr. 93:8-25.

On September 7, 2022, MacDougall officials responded to the August 4, Inmate Request Form, stating that Lieutenant Pearson had inquired about Thompson's request "regarding the boom box matter. However, [Thompson] transferred and no approval was provided. [Thompson] can write to Warden Martin to inquire." Pl. Ex. B at 10.

On September 2, 2022, MacDougall officials responded to the August 17, 2022, Inmate Grievance Form-Level 1 stating, in part, that the Form and any relevant documents must be deposited in the Administrative Remedies box, not through Inter-Departmental mail. Def. Ex. A at 2; Hrg. Tr. 60:24-61:5; Def. Ex. B at 172 (Grievance No. 069). Plaintiff was directed to submit his "completed CN 9602 in the designated box at MacDougall Walker CI", adding, "[t]his decision is not subject to further appeal." Def. Ex. A at 2. ARC Jacaruso testified that even though Thompson was housed at MacDougall and his grievance related to something that happened at Corrigan, the filing procedure required placing the Level 1 grievance in the Administrative Remedies box at MacDougall. Hrg. Tr. 144:4-14. The ARC would provide the inmate with a receipt with a transfer number and the Level 1 grievance would be routed to Corrigan to be addressed. Hrg. Tr. 144:15-18. ARC Jacaruso stated that the disposition rejecting the August 17, 2022, Level 1 grievance was solely based on the manner in which Thompson delivered the Level 1 grievance, not on the content of the grievance. Hrg. Tr. 144:19-145:6; 147:14-16. ARC Jacaruso stated he did not speak to anyone about the substance of the grievance because there was a process error. Hrg. Tr. 152:17-20. Had Thompson refiled the Level 1 grievance in the Administrative Remedies box it would have been processed and forwarded to Corrigan. Hrg. Tr. 144:19-23.

The August 17, 2022, Level 1 Grievance was the only grievance filed by Plaintiff that arguably related to a retaliation claim. Hrg. Tr. 64:4-7. Plaintiff did not resubmit the August 17, 2022, Level 1 Grievance in the Administrative Remedies box, or file a Level 2 appeal. Hrg. Tr. 63:18-25. Plaintiff, as he acknowledged, did not to mention anything about retaliation in the August 17, 2022 Grievance. Hrg. Tr. 64:20-65:2.

## IV. DISCUSSION

### A. Defendant Established that Plaintiff Did Not Exhaust Administrative Remedies

Exhaustion of administrative remedies is an affirmative defense. *Lindsay v. Cook*, No. 3:19CV1486 (JCH), 2021 WL 5827080, at *4 (D. Conn. Dec. 7, 2021) (citing *Jones*, 549 U.S. at 216). "Thus, the defendant bears the burden of proof." *Cunningham v. Lupis*, No. 3:21-CV-00273 (SVN), 2024 WL 811849, at *9 (D. Conn. Feb. 26, 2024). Here, Plaintiff does not dispute that he failed to exhaust his administrative remedies on either grievance at issue in this case. Hrg. Tr. at 4:3-8. Accordingly, Defendant met his burden of establishing his affirmative defense. *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) ("It is well-established that a defendant . . . bears the burden of proving its affirmative defense.").

### B. Plaintiff Failed to Establish that the Grievance Process was Unavailable to Him

"Once a defendant establishes that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must show that the administrative remedies were not available to him under *Ross*, or present contrary evidence that he did in fact exhaust his administrative remedies." *Cunningham*, 2024 WL 811849, at *9 (citing *McLean v. Harris*, No. 9:19-CV-1227 (BKS/ATB), 2022 WL 1129811, at *4 (N.D.N.Y. Feb. 9, 2022)). For the reasons that follow, the Court finds that Plaintiff has not presented credible evidence demonstrating that the grievance process was unavailable to him.

As discussed above, AD 9.6(6) was in effect at the time of the alleged deprivation of Plaintiff's Eighth Amendment and First Amendment rights that gave rise to Plaintiff's grievances and this litigation. There is no dispute that Plaintiff had access to the DOC's administrative directives and was aware of AD 9.6(6) and demonstrated he was capable of following the requirements.

### 1. Eighth Amendment Deliberate Indifference Claim

With respect to his Eighth Amendment deliberate indifference claim, Plaintiff argues that the DOC's grievance procedure operated as "a simple dead end." He argues that he was unable to exhaust his administrative remedies because Martin and other DOC employees repeatedly and consistently refused to consider his requests for a single cell based on his serious autoimmune condition, despite several requests from Thompson, his medical provider, his legal advocates, and the Attorney General's office, and despite the persistent deadly threat of COVID-19 at Corrigan. ECF No. 111 at 7. The Court disagrees.

Plaintiff filed a single, Level 1 grievance related to his Eighth Amendment claim on January 22, 2021. Def. Ex. A at 29-32; Def. Ex. B at 58. On January 28, 2021, Plaintiff was seen by Dr. Emily Hsu at UConn Health to address his diagnosis of "chronic mild neutropenia and thrombocytopenia". Pl. Ex. F. The Level 1 grievance was marked received on February 4, 2021. Def. Ex. A at 31. The grievance was denied on February 28, 2021, and indicated that Plaintiff could appeal to the District Administrator. Def. Ex. A at 29-32, 38. Plaintiff never filed a Level 2 grievance. Def. Ex. B at 58. However, Plaintiff acknowledged that there was nothing in the January 22, 2021 Level 1 Grievance referencing his white blood cell issue, Hrg. Tr. 81:2-5; Ex. 1-1 at 2, and he met with Dr. Hsu at UConn on January 28, 2021, and received the doctor's treatment record recommending isolation *after* he filed the Level 1 Grievance. Pl. Ex. F; Hrg. Tr. 81:9-82:8; 83:14-

24. Plaintiff could have filed a new Level 1 Grievance based on this medical condition and appended Dr. Hsu's recommendation that he "continue to be in isolation in his cell," but he did not. Hrg. Tr. 84:4-19; Pl. Ex. F. Plaintiff could have filed a Level 2 Appeal for reconsideration by the District Administrator and attached the treatment record demonstrating there was new information supporting a request for a single cell, but he did not. Hrg. Tr. 85:5-86:5. Importantly, Plaintiff testified that he was familiar with the Grievance Process. Hrg. Tr. 92:1-7. He stated that in 2020-2021, the relevant time period, he was aware of Administrative Directive 9.6 and he had a copy of the Inmate Handbook.[12] Hrg. Tr. 98:16-99:6. He admitted, however, that he did not know what the District Administrator would have done had he filed a Level 2 appeal and provided medical documentation. Hrg. Tr. 97:16-19.

Plaintiff argues that the grievance process was "unavailable" to him because DOC officials, including Warden Martin, were consistently unwilling to grant his request for a single cell. ECF No. 117 at 118-10; Hrg. Tr. 97:6-15. Plaintiff testified he spoke to multiple correctional officers and medical personnel requesting single cell status due to his immune condition. Hrg. Tr. 13:19-24. "Administrative remedies are not 'available' if prison officials 'interfere[ ] with an inmate's pursuit of relief' by misleading him to think that he has done everything necessary to initiate the grievance process or threatening him with retaliation." *Riles*, 656 F. App'x at 580 (quoting *Ross,* 578 U.S. at 644 & n.3). Plaintiff acknowledged at the hearing that the officers told him they had no authority to order him on single cell status.[13] *Id.* at 13:22. Nevertheless, even if the Court were

---

[12]    In February 2023, Plaintiff filed a Level 1 Grievance related to a disciplinary ticket that he received. Def. Ex. A at 9-11. His grievance was upheld in part by Warden Martin. Def. Ex. A at 11.

[13]    Lieutenant Bragdon testified that he was not familiar with the Dr. Hsu's treatment record recommending that Plaintiff be isolated in his cell. Pl. Ex. A; Bragdon Tr. 27:2-3; Pl. Ex. F. He stated, "I would never directly receive these documents. But if a discussion came up about this scenario, that verbiage, I would have to discuss it either with my superiors or also with medical."

to disregard the contradictions in Plaintiff's testimony,[14] "[a]n inmate [] cannot avoid the exhaustion requirement merely because he believes, however unreasonably, that it would be futile to file a grievance." *Keitz v. Terragnoli*, No. 14-CV-6600 CJS, 2016 WL 75242, at *3 (W.D.N.Y. Jan. 6, 2016); *see Yeldon v. Ekpe,* 159 F. App'x 314, 316 (2d Cir. 2005) (summary order) (finding that the plaintiff's excuse for failing to exhaust the available administrative remedies (i.e., a sergeant corrections officer informed him that any appeal of the denial of his grievance would be futile) does not constitute special circumstances "because it does not render the grievance system 'unavailable' to [him]"); *Hayes v. Herb*, No. 9:11-CV-1271 (GLS/DEP), 2014 WL 1292235, at *13 (N.D.N.Y. Mar. 31, 2014) (Sharpe, J. *adopting report and recommendation of* Peebles, M.J.) ("Even if it is true that plaintiff was informed by others that he could not grieve defendant Herb's alleged retaliation, that does not render the grievance procedures unavailable to him."); *Turnage v. Dzurenda*, No. 3:13-CV-838 (VLB), 2015 WL 4978486, at *4 (D. Conn. Aug. 20, 2015) (finding that holding a "subjective belief that an administrative proceeding would be futile" is "insufficient to meet the legal requirement for futility."); *Mena v. City of New York*, No. 12 CIV. 0028 (CM), 2014 WL 2968513, at *8 (S.D.N.Y. June 27, 2014) ("It is only when a prison official tells an inmate that he *cannot* pursue his grievance through the administrative procedure that administrative remedies are objectively rendered "unavailable." It is not enough when a prison

---

*Id.* 27:24-28:3. The Court credits this testimony. Plaintiff testified that ARC King told him there was "no point" appealing after writing letters to the Commissioner and Warden Martin and receiving denials "there was nothing else for me to do."  Hrg. Tr. 94:3-95:17. ARC King testified that she never had a conversation with Plaintiff where she told him that filing a Level 2 grievance would be futile. "As part of the process of filing a Level 2, I would never tell an inmate to not do their due process." Hrg. Tr. 130:16-24. Further, ARC King was unaware of Thompson's diagnosis of neutropenia because it was not included in the Level 1 grievance. Hrg. Tr. 6-11. The Court credits her testimony.

[14]    At the hearing Plaintiff was asked, "And so you're not claiming here that Mr. Martin or others were completely unwilling to give you relief in any instance for any grievance, correct?" And he responded, "Correct." Hrg. Tr. at 95:10-13.

official says Plaintiff is unlikely to be successful.") (emphasis in original); *Bookman v. Lindstrand*, No. 9:15-cv-1542 (MAD/DEP), 2018 WL 3121688, at *8 (N.D.N.Y. Feb. 14, 2018), *report and recommendation adopted*, No. 9:15-cv-1542 (MAD/DEP), 2018 WL 1470585 (N.D.N.Y. Mar. 26, 2018) (an inmate's "perception is not tantamount to unavailability of the grievance process."); *Bennett v. James*, 737 F. Supp. 2d 219, 227 (S.D.N.Y. 2010) (observing that a plaintiff's "perception" that filing a grievance would be "futile" is not sufficient to render the administrative remedies "unavailable"). Finally, the Court credits Warden Martin's testimony that he was unaware of Dr. Hsu's medical report and recommendation, Def. Tr. 67:24-25; 69:17-23, 70:12-21. The Warden stated that  a decision to house an inmate in a single cell due to a medical condition would be made in the Medical Unit. Def. Tr. 46:11-13. That is because, if the medical department determined that it was medically necessary to house an inmate in a single cell they could contact AP Operations and it would be handled from there. Def. Tr. 46:9-47:3, 20-25.

Accordingly, the Court finds in favor of Defendant on his affirmative defense of failure to exhaust the Eighth Amendment retaliation claim under the PLRA and finds that Plaintiff has not shown by a preponderance of the evidence that the grievance process was unavailable to him.

### 2.  First Amendment Retaliation Claim

With respect to his First Amendment retaliation claim, Plaintiff argues that he "tried every avenue available to obtain a repair or replacement of his boombox." ECF No. 117 at 8. He contends that the DOC gave him the runaround, misrepresented the status of his grievance and their intent to repair his boom box, transferred him to MacDougall and then told him he was not on the approved boom box list. *Id.* He argues that "this course of conduct by prison officials rendered the grievance process unavailable to [him]." *Id.* Plaintiff's claim under the First Amendment is for

retaliation. Plaintiff has not shown by a preponderance of the evidence that filing a Level 1 Grievance claiming retaliation would have been a "simple dead end".

Plaintiff conceded that the grievance makes no mention of retaliation. Hrg Tr. 64:20-65. Rather, Plaintiff testified that he did not include the word "retaliation" in the August 17, 2022, grievance, explaining that "[w]hen I got to MacDougall, all I wanted was my boom box . . . replaced. After what I went through at Corrigan, I didn't want to start any problem there." Hrg. Tr. 60:5-17. Defendant accurately argues that "the grievance process was *available* to Plaintiff, he just chose not to avail himself of it with regard to his retaliation claims."[15] ECF No. 118 at 7 (emphasis added).

Nor, has Plaintiff demonstrated by a preponderance of the evidence that he was "thwarted" by Warden Martin from exhausting the administrative process. Plaintiff testified that he did not resubmit the August 17, 2022, Level 1 grievance in the Administrative Remedies box, or file a Level 2 appeal. Hrg. Tr. 63:18-25. This was the *only* Level 1 Grievance filed that he identifies as arguably concerning a retaliation claim and it was filed at MacDougall, not at Corrigan where Defendant Martin was the warden. Hrg. Tr. 64:4-7; Def. Ex. A at 2. Plaintiff could have but did not assert a retaliation claim in the August 17, 2022 grievance.[16] Hrg. Tr. 64:20-65:2. Moreover, Plaintiff offered no evidence showing he was prevented from filing the Level 1 grievance. He was merely directed to *refile* the grievance in the Administrative Remedies box, not through Inter-Departmental mail. Def. Ex. A at 2; Hrg. Tr. 60:24-61:5; Def. Ex. B at 172 (Grievance No. 069). Plaintiff states several times in his brief that unidentified "[p]rison officials gave [him] mixed

---

[15]    Question: "And you would agree with me that a property claim is different than a Level I grievance, correct?" Plaintiff: "It is different." Question: "It is a different process, right?" Plaintiff: "It's a different process." Hrg. Tr. 66:8-12.

[16]    Question: "You could have filed something about retaliation in that grievance if you had wanted to, but you decided not to, right? [Answer]: Correct." Hrg. Tr. 64:24-65:2.

messages about his boombox, which first delayed and ultimately prevented him from using the grievance process to obtain relief." ECF No. 117 at 9-10 (arguing that he relied on "statements of [unidentified] prison officials" that were "inconsistent and confusing instructions" and "representations" telling him that his boombox would be replaced.). Plaintiff offered no explanation as to why he could not and did not file any grievance within the thirty day time limit while he was still housed at Corrigan. These purported statements by unidentified prison staff are not persuasive evidence against Defendant Martin. Simply put, there is no evidence that Plaintiff was thwarted by Defendant Martin from filing a grievance for alleged retaliation.

Finally, Defendant argues that the record shows that the administrative remedies system was available to Plaintiff and has provided Plaintiff relief. He argues that Plaintiff ignores that he received partial relief for the lost/damaged property claim when his TV was replaced through the grievance process. ECF No. 118 at 8; *see* Hrg. Tr. 109:22-110:2 (ARC King testifying that Warden Martin approved the replacement of the television). The record also shows that Plaintiff agreed that he received partial relief for unrelated grievances from Warden Martin that post-date the alleged retaliation in this case. Hrg. Tr. 92:1-93-16; Def. Ex. A at 11*; see Hall v. Annucci*, No. 22-2031, 2023 WL 7212156, at *2 (2d Cir. Nov. 2, 2023), *cert. denied*, 144 S. Ct. 1107, 218 L. Ed. 2d 346 (2024) (finding no issue of fact as to whether an exception applies to the inmate's failure to file a grievance where the inmate "had previously used the [process] to file several grievances, including for medical- and health-related issues, that resulted in relief."); *White v. Velie,* 709 F. App'x 35, 38-39 (2d Cir. 2017) (summary order) (holding inmate did not satisfy his burden to show the administrative remedy system was unavailable to him in part because he did not preset "any evidence about the outcomes in the grievance system in general. On this record, he has not shown that prison officials are consistently unwilling to grant relief."). The record shows that

Plaintiff is knowledgeable about the administrative process and has received favorable outcomes undermining his position here.

Accordingly, the Court finds in favor of Defendant on his affirmative defense of failure to exhaust the First Amendment retaliation claim under the PLRA and finds that Plaintiff has not shown by a preponderance of the evidence that the grievance process was unavailable to him.

## V. CONCLUSION

Based on the foregoing, the Court finds in favor of Defendant on his affirmative defense of failure to exhaust under the PLRA. **ECF No. 110, 118**.

**The Clerk of the Court is directed to enter judgment in favor of Defendant Martin and close the case.**

This is not a recommended ruling. The parties consented to the jurisdiction of the undersigned Magistrate Judge, who may therefore direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. ECF No. 65. Appeals may be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c). It is so ordered.

*/s/ Maria E. Garcia, USMJ*
Hon. Maria E. Garcia
United States Magistrate Judge